Filed 4/21/15  John A. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN A.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>        Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | A144264<br><br>(San Francisco County<br>Super. Ct. No. JD14-3182) |

By petition for extraordinary writ, John A. seeks review of the juvenile court's orders terminating reunification services and setting a selection and implementation hearing for his daughter, Giovanna A.  He challenges the juvenile court's finding that he was provided reasonable reunification services, arguing that the Human Services Agency failed to search adequately for him and the child's mother in the months preceding the hearing despite knowing they were homeless and did not have a telephone.  We affirm.

**STATEMENT OF THE CASE AND FACTS**

The San Francisco Human Services Agency (Agency) filed a juvenile dependency petition (Welf. & Inst. Code, § 300)[1] on May 19, 2014, alleging that then two-year-old

_____

[1] Further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

1

Giovanna A. came within the provisions of section 300, subdivisions (b), (d), and (j). As subsequently amended, the petition alleged that the parents' relationship involved domestic violence; that the child had been physically abused by petitioner and verbally abused by both parents; that the mother's history of domestic violence with petitioner, her untreated mental health issues (including a diagnosis of bipolar disorder and schizophrenia) and untreated substance abuse issues required assessment and treatment; that petitioner had an untreated anger management problem, evidenced by violence in a prior relationship, as well as with the mother and the child, and a criminal history reflecting violence and substance abuse; and that the parents' older child had been provided a permanent plan of adoption.[2]

The Agency's detention report described several reports of general neglect by the mother, and physical abuse and domestic violence by petitioner, in April and May. On April 18, 2014,[3] a caller said the child could be heard crying all the time, and was yelled at to "shut the fuck up." In an interview on April 20, the parents told the protective service worker (PSW) that Giovanna was crying because of a bad diaper rash, for which she had been treated at San Francisco General Hospital, explaining that the child had been left for up to a week at a time with the paternal grandmother, who was too old to consistently change the child's diapers. In a separate interview on April 21, at the Hamilton Family Shelter (Hamilton), petitioner disclosed that he was on probation for a misdemeanor due to his son calling the police two months before and alleging petitioner was holding a knife to the mother, which petitioner later said was a lie told while his son was high on methamphetamine. Petitioner also disclosed having a domestic violence history with another woman he described as " 'crazy.' " The mother denied domestic violence and said petitioner's son was high on drugs when he called the police.

On April 28, the mother reported that she left Hamilton and went to a domestic violence shelter after petitioner hit Giovanna on her legs, arms, and buttocks; a staff

---

[2] The petition initially described petitioner as the alleged father; he was later declared the presumed father and the petition was amended accordingly.

[3] All further dates refer to the year 2014 unless otherwise specified.

2

member indicated she was helping the mother obtain legal services to file for a restraining order and seek custody. Petitioner denied yelling at or hitting the child and believed, contrary to the mother's report, that he and the mother were still together.

On May 9, it was reported that the minor was wearing dirty clothes, her hair was uncombed, and the mother did not redirect her when she hit other children or ran up to strangers. The mother reported that she was seven months pregnant, was bipolar and schizophrenic, and had a history with methamphetamine eight years before.

On May 15, it was reported that the mother stayed at a shelter and told staff she got a restraining order against petitioner because she did not like the way he "cusses at [the child] and spanks her." The family had spent the previous night together at the shelter because the mother did not show paperwork for the restraining order. Petitioner was overheard spanking the child in a stall in the bathroom as she cried for him to stop, then telling her, "Shut the fuck up." Petitioner told a responding PSW that he would tell the child to shut up when she ran around at night because he was afraid they would be kicked out of the shelter; he did not think it was abusive to tell his two year old to shut up because this is how he was disciplined as a child. He said he had been staying at a men's shelter but the mother called him that night to come stay with her and Giovanna. The mother said she was afraid of petitioner due to domestic violence and was considering a restraining order.

The PSW brought the mother and child to San Francisco General Hospital for the child's rash to be further evaluated. The mother became agitated when told her assigned PSW was coming to complete the current investigation and tried to leave with the child; when told she could not take the child without a safety plan in place, the mother "attempted to push the stroller with Giovanna down a flight of concrete stairs," requiring a doctor to intervene "so the child would not be hurt" The mother continued to "decompensate emotionally," struggled with responding police officers, and was placed in handcuffs; the child was taken into protective custody.

At a hearing on May 20, Giovanna was detained and placed in foster care, and supervised visitation was ordered for the parents. A settlement conference regarding jurisdiction and disposition was set for June 18.

The Agency's jurisdiction/disposition report filed on June 13 related that after Giovanna was detained, the parents initially engaged with the PSW and met with their respective case managers from the Homeless Prenatal Program (HPP), and the mother began supervised visitation. Petitioner never appeared for visitation; the mother had one visit but then missed three consecutive visits and the center cancelled visitation. The parents also stopped responding to their case managers, and their cases at the program were terminated. The parents had "not availed themselves to the Agency," preventing the PSW from obtaining background information and assessing their current situation. It was noted that "by all accounts, the parents appear to be homeless as they both provided their last known addresses as homeless shelters." The PSW reported having "attempted to locate the parents by visiting their last known addresses to no avail," "attempted to contact with the parents on their respective telephone numbers to no avail," and "submitted a long search on behalf of the parents." The social worker who conducted the "parent search" requested by the PSW called the phone numbers listed for petitioner and for the mother multiple times and left messages but never received a return call. The social worker called Hamilton, the last known address for both parents, and was told that the parents had been staying there for over a month and would be told to call the number the PSW left when they returned that evening; neither parent returned the call. The social worker attempted to get a current address or phone number for petitioner from the San Francisco Probation Department but was unsuccessful because he was not on probation; and the social worker found a prior address petitioner had used for General Assistance and mailed a letter but did not receive a response.

Both parents were present for the settlement conference on June 18. Both submitted to the petition, as amended, and Giovanna was declared a dependent. A reunification plan was adopted and dispositional findings were stayed until August 12.

4

The court ordered supervised visitation for both parents once a week for three weeks, to be increased to twice a week if the parents appeared for all visits.

For more than six weeks after the June 18 court date, the parents did not contact the Agency to arrange visits, ask about Giovanna or request services. On July 7, they failed to attend a meeting with the PSW that had been scheduled to go over the case plan and set up visitation. On July 11 and 16, the PSW attempted to locate the parents by walking around the public library, where they had been reported to be, but was unsuccessful. The PSW tried to locate them at Hamilton and was informed they were no longer residents. The PSW attempted telephone contact on July 2, 9, 15 and 29. On July 30, the PSW sent separate letters to each of the parents specifying the Tenderloin Outpatient Clinic (Tenderloin Clinic) as their provider for individual therapy and the Homeless Prenatal Program (HPP) as the provider for parenting classes. These letters were to two addresses: a post office box mailing address the parents had given to the court and the home of petitioner's mother, with whom the parents had previously resided and whom both identified as a primary support person.[4]

The parents' new baby was born on August 2. The mother tested positive for cocaine on July 30 and August 2, and the new baby tested positive for cocaine at birth. The mother had not drug-tested since and denied using cocaine, saying a friend had laced her cigarette with cocaine without her knowledge. The baby was removed from the parents' custody on August 4.

After the new baby was removed, the PSW arranged visits with both the baby and Giovanna twice a week, and from August 18 until September 25, the parents visited consistently. Petitioner, however, was reported to have "trouble staying up" during visits and the staff and mother "would prompt [him] to stay awake."

---

[4] Petitioner had told the PSW that his support network consisted of the mother, his mother, and his sister; the mother had stated that her support network consisted of petitioner and his mother.

The parents were "extremely difficult to keep in contact with" and the PSW was able to meet with them only when they visited the children.[5] On August 5, 7, and 18, and September 4 and 25, the PSW gave the parents information on the Tenderloin Clinic, where they could request therapists' services, and encouraged them to attend a parenting class at HPP and request a HPP case manager to look for housing.

The PSW encouraged the parents to enter Jelani House for housing and treatment, and provided them with information for the program on August 7, 15, and 25. She also provided a list of shelters and free pantries on August 26 and September 4. As of August 26, the parents reported getting food at free community organizations, sleeping in the park outside the court, and travelling with their belongings in a rolling suitcase. Petitioner told the PSW that he walked around downtown when upset and that he had been focusing on getting a job, which had helped with his mental health status. He reported that he had been diagnosed with schizophrenia at age 15 but did not agree with the diagnosis; that he felt he might have bipolar disorder because he got angry easily and felt his mood can change easily; and that as a child he was prescribed Ritalin, which made him feel "crazy."

On September 18, the intake coordinator of Jelani House told the PSW that when he met with the parents on September 11, petitioner's breath reportedly smelled of alcohol and he "kept almost falling asleep" during the interview. The coordinator said that he would be able to accept the parents into Jelani House after they "detoxed" but they "did not look in good shape physically or mentally" and he wanted them to get medical and mental health evaluations. On September 25, the PSW told the parents that the coordinator wanted them to detox before entering the program and asked them to attend an orientation at Healthright 360, where they could be processed for inpatient

---

[5] The PSW met with the parents at the hospital on August 4 and the mother provided a new telephone number. The PSW tried to contact them at this number on August 4 and then was given a new number on August 5. On August 11, the mother left a message saying the phone had been stolen and there was no way to reach her. On August 15, the mother contacted the PSW and said they had a new phone but they could only call the PSW.

treatment centers, writing down for them the address and time of the orientation. To the PSW's knowledge, the parents did not attend.

After September 25, the parents failed to call to confirm their visits with the children, as a result of which visits were suspended. The PSW was unable to contact the parents. On October 6, the mother left a voicemail message for the PSW but did not leave a call-back number. Neither parent had contacted the Agency since. The PSW sent additional letters "detailing the parents services" to each of the parents on October 23 and November 12, to their post office box address and to petitioner's mother. The PSW also had had weekly contact with petitioner's mother in the hope that petitioner would return to her home. Petitioner's mother said she had not been in communication with either of the parents; that if she was, would ask them to contact the PSW; and that she had had her daughter go to San Francisco on two occasions to look for the parents, to no avail. The PSW also reported having completed an "Absent Parent Search" on June 18 and on October 7. At the time the report was written, neither parent had initiated therapy or completed a parenting class.

Giovanna was living in a foster home with her infant sister and appeared to be close with her foster mother. She had had difficulty adjusting to the foster home, refusing to bathe or shower and having daily tantrums, but these behaviors were decreasing. During the period when the parents were visiting, Giovanna was able to identify her parents, told them she loved them, and asked to go with them when they were leaving. When she did not see her birth mother, she became confused about who her mother was and on one occasion told the PSW her foster mother was her mother. The Agency was exploring possible adoption by maternal relatives in Seattle but they did not feel able to take both Giovanna and her infant sister and the Agency did not want to separate the girls. The foster mother had expressed possible openness to adoption.

The PSW stated that the parents' inconsistency had been confusing for Giovanna who, at age three, needed to find a permanent placement as soon as possible so as to begin to attach to a primary caregiver. The Agency recommended that reunification

services for the parents be terminated and that a section 366.26 hearing be set to implement a permanent plan for Giovanna.

At the contested six month review hearing on January 29, 2015, the court heard testimony from the PSW and the mother; petitioner was present and his attorney cross examined the witnesses. The PSW testified that the parents had their first therapy session on January 15, 2015. They had not completed a parenting class; the PSW had no information that they had obtained suitable housing; they had not visited Giovanna since September 25; and they had not provided any evidence of having undergone psychological evaluations. The parents had contacted the PSW on December 6 seeking to restart visitation and the PSW made the referral for this purpose. The visitation center would not take the parents back, however, because of their previously having missed consecutive visits; this meant visitation had to be arranged through the family resource centers, which had a long wait list. The PSW had asked to have visits take place at the Agency office, and the first visit was scheduled for the following week.[6]

Asked on cross examination by petitioner's attorney whether she had made any referrals to residential programs for petitioner in September and October, the PSW testified that she was not in contact with him. She made referrals in June for therapy,

_____

[6] The PSW testified on cross examination by counsel for the mother that the mother had been in frequent contact with her for the six weeks preceding the hearing and they had met once; the mother reported having been clean and sober for three months and she had attended over a dozen Narcotics Anonymous meetings "recently"; she said she was participating in substance abuse counseling at Glide and wanted to return to treatment at the Tenderloin Clinic. The mother had drug-tested on January 15 but then missed tests on three subsequent dates in January.

The mother testified that she had been willing and able to drug test for about two and a half months but aside from the most recent test had not been able to do so because no referral had been put in, she did not have a working cell phone and, for a while, she did not have identification. She had been attending Narcotics Anonymous meetings and had had two sessions of substance abuse counseling; she was receiving mental health and substance abuse therapy at the Tenderloin Clinic. She had been willing and able to visit her children but there had been issues with arranging visits. For the two weeks prior to the hearing, she had been living at petitioner's mother's house and was trying to pursue housing through Tenderloin Housing and Glide.

drug testing and HPP, and the referral for visitation when the parents contacted her on December 6. She did not make any referrals for parenting classes from June to December 2014, and did not make any referrals for domestic violence classes; on follow-up questioning by the court, the PSW testified that the court had not ordered petitioner to attend domestic violence classes and that she had asked the parents to focus on getting into a treatment program before trying to do a parenting class.

The mother testified that the PSW did not provide her and petitioner with referrals for housing programs other than Jelani House, which informed them in September that they did not have space. In October, she and petitioner contacted Walden House on their own initiative, not a referral from the Agency. They tried to enter an outpatient program at the Tenderloin Clinic in November and to reenter HPP and get a parenting class "reevaluated" in December, and they attended programs together at Glide Memorial Church (Glide). The mother testified that the PSW did not provide her with any referrals in December and the only referral from the Agency in November was for visitation. She also testified that, contrary to the PSW's testimony that she did not have contact with the parents in October and November of 2014, the PSW had contact with her and petitioner "very frequently." She testified that "[i]t's just between the times of . . . I think it was September through August I did not have a phone," although she then acknowledged she did not have a phone in October and a phone she had in November was stolen. For the two months preceding the hearing, the mother said she called the PSW "[p]robably almost every day . . . [¶] [i]f not all day every day. Texting, this, that, and the other."

At the conclusion of the hearing, the juvenile court ordered that reunification services be terminated and set a section 366.26 selection and implementation hearing for May 27, 2015.

On February 4, 2015, petitioner filed his timely notice of intent to file a writ petition.

## DISCUSSION

Petitioner contends the juvenile court's orders were unjustified because the Agency did not offer or provide reasonable reunification services. Specifically, he

9

maintains the Agency failed to provide reasonable services in October, November, and December 2014, in that it failed to adequately search for him and the mother, whom the Agency knew to be homeless and without a telephone.

As Giovanna was less than three years old when she was removed from her parents' custody, the proceedings below were governed by section 366.21, subdivision (e): "If the child was under three years of age on the date of the initial removal . . . and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal . . . may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing."[7]

The juvenile court made findings that the parents had failed to participate regularly in any court-ordered treatment plan; that there was not a substantial probability the minor could be returned to the parents within the next six months; and that the Agency had made reasonable efforts to aid the parents in overcoming the problems that led to the dependency. The court found that the parents' progress toward alleviating or mitigating the causes necessitating placement had been minimal.

"When we review a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which supports the trial court's determination. We must resolve all conflicts in support of the determination, and indulge in all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact. (*In re Katrina C.* (1988) 201

---

[7] Section 361.5, subdivision (a)(1)(B), provides: "For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care as provided in Section 361.49 unless the child is returned to the home of the parent or guardian."

10

Cal.App.3d 540, 547; *In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)  And, in reviewing the reasonableness of the reunification services provided by the Department, we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect.  The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances.  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)”  (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)  The Agency is required “to ‘make a good faith effort to develop and implement a family reunification plan . . . [with] the objective of providing such services or counseling “as will lead to the resumption of a normal family relationship.” ’ ”  (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424, quoting *In re Christina L.* (1992) 3 Cal.App.4th 404, 414.)

After Giovanna was detained in May 2014, the Agency provided referrals for the parents to HPP.  Petitioner met with his case manager only once, then failed to respond to his case manager and was terminated from the program as a result.  The Agency arranged visitation, but petitioner did not visit.  Petitioner and the mother both failed to contact the Agency, and the Agency attempted to locate them by visiting their last known addresses and calling the telephone numbers they had provided.  A senior social worker conducted a search consisting of calling each of the parents’ telephone numbers multiple times and leaving messages; calling Hamilton, the last known address for both parents, and leaving a message the social worker was told would be delivered when the parents returned that evening; contacting the San Francisco Probation Department to try to obtain a current address or phone number; and mailing a letter to an address petitioner had previously used for General Assistance.

Petitioner appeared for the June 18 settlement conference and submitted to the petition, but then failed to contact the Agency for over six weeks, including missing a meeting on July 7 that had been scheduled to discuss the parents’ case plan and set up visitation.  On two occasions, the PSW tried to find the parents by walking around the public library, where they had been reported to be; the PSW also contacted Hamilton and

11

was told the parents were no longer residents; and on several occasions attempted to reach the parents by telephone.

Contact between the parents and the Agency apparently resumed in the first days of August, when the new baby was born and removed from the parents' custody. Petitioner attended visits with Giovanna consistently between August 18 and September 25, although it was reported that petitioner had trouble staying awake during the visits and had to be prompted by the mother and staff. But after September 25, both parents ceased both visiting and contacting the Agency. Only on December 6—after more than two months without visits and immediately after the Agency's report recommending termination of reunification services was filed—did the parents contact the Agency requesting that visitation be restarted.

During the weeks in August and September when the parents were visiting Giovanna, the PSW gave the parents lists of shelters and free pantries and information about the Tenderloin Clinic, for therapy; encouraged them to seek services for housing and parenting education at the HPP; and encouraged them to enter Jelani House for housing and treatment. After the PSW learned that the parents had attempted to enter Jelani House but the intake coordinator wanted them to "detox" first, she directed the parents to a program that would assess them for inpatient treatment centers. The parents did not attend this program and petitioner made no further contact with the Agency; the mother left one telephone message in October but did not leave a call-back number.

Petitioner complains that the PSW made "minimal" referrals for petitioner, only Jelani House and HPP, and when he was denied entry to Jelani House, PSW made only one referral to a program to help him become sober. But petitioner did not follow up on the referrals the PSW provided: He stopped responding to his HPP case manager, and he did not attend the program that could have assessed him for inpatient treatment after Jelani House specified detoxification as a prerequisite for entry. The PSW provided information about referrals to the parents in person during the period when the parents were visiting Giovanna, and when unable to reach them continued to attempt to provide

information about service providers by sending letters to petitioner and the mother at the mailing address they had given the court and at petitioner's mother's address.

Petitioner further complains that the Agency made "no efforts" to provide services in October, November, and December, and made no effort to search for them despite knowing where he and the mother spent the daylight hours. The PSW had previously attempted to search for the parents by walking around the public library area and had been unsuccessful, and the efforts of petitioner's family to locate him by means of a physical search had also failed. The Agency attempted to reach petitioner by telephone and by mail, and by staying in close touch with petitioner's mother, the one person the PSW knew the parents had previously been in touch with and considered to be supportive. As the juvenile court pointed out, petitioner's homelessness did not preclude him from making any effort to maintain contact with the Agency: If unable to find access to a telephone, petitioner could have come to the Agency's offices to pursue reunification efforts.[8]

"The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing

---

[8] In response to petitioner's attorney's argument that the Agency had provided insufficient services, the juvenile court asked what the Agency was supposed to do if petitioner was not reachable by phone and refused or failed to contact the Agency; counsel's response was that the mother had testified "attempts were made" to reach the social worker. The court then stated, "And the social worker is located in the city and county of San Francisco, correct? . . . And there's a building that one can go to in lieu of a phone. If you don't have a phone and you have a young child who is in the dependency system, you can walk down to the location and actually sign in and try to see the social worker, is that correct?"

the juvenile court to go "on hold" while the parent makes another stab at compliance." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

In this case, it is apparent that the Agency made reasonable efforts to offer petitioner services. Petitioner did not avail himself of the services he was offered.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)


_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Stewart, J.